May it please the Court, Joseph Daley on behalf of the appellants AIPTF and Teamsters, I've asked to reserve three minutes for rebuttal. Your Honors, given the numerous moving parts in this Summary Judgment Appeal that involves one of the largest accounting frauds in history, I'd like to focus this morning on the Morrison Domestic Transaction issue and then, with the Court's indulgence, spend a few more minutes on the Japanese Law issue. Now, in Stoyes, this Court held that plaintiffs may establish a domestic transaction satisfying Morrison by showing either that title to the relevant security passed here or that irrevocable liability for either the seller or the buyer, again, of that relevant security happened here in the United States. This Court also observed in Stoyes that an amended complaint in this particular case, quote, could almost certainly, end quote, allege sufficient facts establishing that AIPTF's ADR purchase was a domestic transaction. And that's precisely what we did. We came back, we amended the complaint, and we alleged and backed up with documentary evidence the undisputed United States side's actions comprising the ADR's purchase and sale. On March 20th, 2015, a Friday, pardon me, Clearbridge places the relevant ADR order with Barclays. Counselor, if we follow your argument, then any purchase of any ADR would be sufficient? Any purchase of any ADR, so long as it happened within the United States. And so long as, and please, I spoke too quickly, so long as either irrevocable liability of the seller or of the purchaser occurred here in the U.S. or the passenger title occurred here. And that's exactly what happened. So three days after that original order, the very same two parties, still in New York City, having a back and forth communication, noting the agreed upon price for executing the order, and Barclays specifically saying that it is filling the ADR ticket. And at that moment, our expert, Andrew Levine, a 30-year ADR industry expert, who by the way actually worked on Toshiba ADRs in his past, but not this particular grouping, at that point our expert says that Clearbridge was obligated to pay for the ADRs. And that's in the record at four excerpts of record, page 531. Also at that point says, I believe my microphone's off. Can you hear me okay? We can hear you. Okay, I'm sorry. It's on. Okay, I'm sorry. And also at that point, said Mr. Levine, Barclays was obligated to deliver the ADRs to Clearbridge. And that also, obviously, is a moment of irrevocable liability. Three days after that, Barclays settles, puts 36,000 ADRs into AIPTF's account at Amalgamated Bank, also in New York City. On that very same day, AIPTF pays to Barclays $922,000 for those ADRs from its Amalgamated Bank account in New York City. So there are the facts. And this court, in its previous opinion, explained quite cogently that ADRs and foreign shares underlying them are separate securities. And that title to one is not legal title to the other. And that is at this court's opinion at 896 F3rd 942, and then again at 940. So the district court here committed reversible error by several actions. It did not look to the U.S. purchase, sale, or passage of title of the relevant security, the ADRs. I mean, earlier this morning, I listened to the tattoo case. And it's as if, just a quick analogy here, these ADRs are Miles Davis's recordings. Our client wants Miles Davis's recordings, but it doesn't have them. Barclays says, well, we'll get them for you, and here's the price, and would you agree to pay the price? Yes. And then Barclays has to go to Japan and give some Dave Brubeck recordings to swap with somebody in order to get the Miles Davis recordings. Mr. Daley, I'm trying to figure this out on both sides, this idea that we've got, I think, two securities, and we're asking about the purchase of one with reference to a purchase of the other. But if we go by your theory, and I understand this isn't before us, but don't you have a problem with the in connection with requirement? I mean, in other words, what you're suing on is you're suing on fraud with respect to an ADR, domestic ADR, in connection with an unsponsored ADR, in connection with fraud that's happened overseas. What are we supposed to do with that? And this court said in Stoyes quite clearly, I'm afraid I don't have the pin site, that what the foreign issuer, the underlying fraud has nothing to do with the in connection with the purchase or sale here in the United States of that relevant security. For purposes of the Morrison analysis, or for purposes of further down the line in terms of, I mean, if we have two different securities, and you're alleging fraud in the purchase of the ADR. The ADRs, which are affected by the underlying fraud in the foreign country, but again, Morrison. They're in connection with peace. There are several areas of connection. There's connection with the fraud that happened with the underlying securities, but there's also the fraud in connection with the purchase of the inflated securities in this country. And the district court did not, of course, do that. The district court looked to a different transaction, a different security between Barclays and a different party. It was Barclays and someone selling to Barclays, Toshiba Common Shares. The district court further erred in holding as a matter of law that Barclays had acted as AIPTF's agent when it purchased its own Toshiba shares over in Japan, and when the clear record evidence contradicts that holding. So the ADR confirmation slip at page, record page 4-ER-521, unequivocally states that Barclays acted as a principal in this transaction. The confirmation slip itself says at page 1-SER-11 that it was, quote, conclusive proof, end quote, of the relevant contract. And then we have Barclays' head ADR trader, Timothy Jeneers. Not only is he Barclays' head ADR trader, he was involved in this particular ADR transaction. And when he was deposed, he said not once, not twice, three different times he confirmed that, yes, we acted as a riskless principal in this ADR deal. And yet the district court didn't mention either of those two pieces of evidence. The district court further erred in not crediting or not even acknowledging the unchallenged testimony of our expert, Mr. Levine, whom I've already introduced you to. Toshiba did not challenge Mr. Levine's credentials under Daubert or his methodology. Very likely they couldn't given his experience. Mr. Levine used myriad pieces of documentary evidence supporting his expert opinion that the relevant purchase, sale, exchange of title in that relevant security all happened here in the U.S. And I understand they're trying to say that Mr. Levine made an improper legal conclusion, but he did not say, in my opinion, under Morrison, this has satisfied the domestic transaction criteria under Morrison. He just, using his experience and 30 years in the industry as well as the facts of this case, opined that the relevant purchase, sale, and transfer of title happened right here in the United States. One little, not little, pardon me, one final error of the district court that we mentioned in our briefing. The district court erred by heightening the pleading and proof burdens facing the plaintiffs. And this court said so in the Lumie Nation case. That is a reversible error and that's exactly what the district court here did. You know, your honors, at bottom, the district court's holding contradicts this court's express direction to look at the facts concerning the relevant transaction. Which transaction here is the sale and purchase of 36,000 ADRs. Not Barclay's separate purchase in Tokyo of separate Toshiba shares, which it put into its own account and then later put into the Citibank cross book in exchange for the ADRs. Now if I could turn briefly to the Japanese law question. The central question there, your honors, under this court's de novo review, and as a matter of Japanese law, do the Teamsters qualify as a person that acquires securities within the meaning of JFIA's Article 21-2? And the answer there is yes. The most straightforward way to answer a question like that under federal rule of civil procedure 44.1, determining foreign law, let's examine the de facto precedent from Japan's Supreme Court. Now I know your honors are aware, and both parties concede, that while Japan is a civil law nation, both plaintiff's expert and the Toshiba's expert agree that the decisions by that Supreme Court have de facto binding force of precedent. And that agreement is in the record at 2-ER-92, paragraphs 18 and 19. And so to look at that de facto binding precedent, let's look at the 2012 live door decision. And that's where the Supreme Court was interpreting Article 21-2 of the JFIA Teamsters claim. And that article, by the way, I'm sorry, that act in Article 1 states that its purpose is the protection of investors. And so as you read through live door, and I admit it's a slog, I've read through it several times myself. As you read through it, and you read through the translation, live door repeatedly identifies the recipient of that article's damages remedy as the, quote, investor who sustains losses, the Toshisha in Japan, all right? The investor who sustains losses. Teamster is the investor here who sustained the losses. Toshiba can't point to anybody else that can claim damages on those several hundred thousand shares of Teamsters. Now, Toshiba does like to point to a different statute, the BETA, the B-E-T-A, the Book Entry Transfer Act. And although live door issued several years after the Japanese diet enacted BETA, live door's majority and concurrence never refer to, never use BETA's Article 140, like Toshiba does, to say that the only recipient of this damages remedy can be somebody that only acquires those shares under BETA. BETA is a ministerial statute. It's a way, it's a way under Japanese law to streamline and to smooth the passage of securities and their rights and dividends and things like that around the country. It was not meant, at least we allege it's not meant, we argue that it's not meant to prevent people from recouping their damages under Article 21-2. And again, despite all of this, this is another factor that the district court here did not even mention when it was convinced by that Tokyo district court decision to reconsider its denial of summary judgment on the Japanese law. And with respect to district courts all over the world, that district court is at the bottom of the three tiers of Japanese law. That district court decision has no binding precedent, all right? The Supreme Court has de facto binding precedent. That Japanese court has no binding effect. In fact, it has no binding effect even on the parties to that decision because that decision is now on appeal. But why wasn't our district court entitled to consider that decision? Certainly no disagreement there whatsoever, Judge Mendoza. Certainly entitled to consider it, but under Rule 44.1, the court is supposed to consider all relevant materials, right? And that was just one small piece, and we argue that that was very much overshadowed by everything I've just said about the live door decision. I'd like to reserve, if I may, the remainder. All right. Thank you. Good morning. Christopher Curran for Toshiba. I've got a lot to say about the AIPTF and U.S. Exchange Act issues, but maybe for sake of continuity, I'll pick up with this Japanese law issue. Obviously, we have in our favor a squarely decisive decision by this three-judge panel of the Tokyo district court, and it held unequivocally and authoritatively that only a registered shareholder whose name appears on the shareholding records has standing to bring a claim under Article 21-2. My friend, Mr. Daley, emphasizes a live door decision by the Japanese Supreme Court for many years earlier. That case did not deal with statutory standing. That dealt with how you calculate damages. And the Tokyo district court decision acknowledged live door and its limitations. And I'm going to point this out specifically because I know that the plaintiff's reply brief to this court said that the Tokyo district court did not consider the live door decision at all, but in fact, it cited it in the relevant discussion, and you'll find that in 2 ER 68. So the Tokyo district court, and you see the excerpts, right, from that decision. It is a very elaborate discussion and analysis of the issue. It arises in connection with claims brought by Toshiba shareholders. Counsel, can you get to the Morrison issues? To me, that, I'm interested in what you have to say there. Sure. It seems to me, as someone who authored Stoius, that somehow this argument that there were two transactions and not one transaction is designed to get right around what we wrote in Stoius. Yeah. I mean, it's a nice argument, but it really misses the point of the first opinion in this case. Well, okay, may I address that? Yes. So when this case first came to this court, including Your Honor, Judge Wardlaw, the allegations were that the plaintiffs bought their ADRs OTC in the U.S. on the secondary market. That was the allegation that came to Your Honor, and Your Honor did say in writing your opinion there that the plaintiffs can almost certainly prove that it was a domestic transaction, but that was assuming, as I was when I argued that case in front of Your Honor, that they were right when they said they purchased the ADRs over-the-counter here. Now we went back down. Judge Pregerson denied our renewed motion to dismiss, and we went into discovery. And lo and behold, we learned they didn't buy the ADRs like normal secondary market purchasers over-the-counter in the U.S. They had their broker-dealer go to Japan, buy the underlying common shares, and then convert those into ADRs. So this case now comes back to this court in a very different factual posture than we had before. And the discovery, which was comprehensive, you see, we have deposition transcripts, we have Bloomberg chats, we have underlying transactional documents. It shows that Clearbridge, the investment manager for AIPTF, instructed its broker-dealer, which is almost by definition an agent, right, SEC versus Murphy, to go and obtain ADRs. Then Barclays, the broker-dealer, comes back and says, well, we're going to have to go to Japan to buy the underlying shares. Here's the price. Here's our commission. Here's the exchange rate we're going to use. That is instructing an agent to go overseas to buy the shares. Once those shares are purchased by Barclays as agent for Clearbridge and AIPTF, that is where irrevocable liability attaches. That is where AIPTF and Clearbridge become obligated to proceed with the transaction because it's done. The agent has taken the action in reliance on the instructions. So then, and the only difference here, the reason why I was going to try to start with the NITTF Teamsters issue is because that's the same thing that happened there, right? Teamsters bought their shares by instructing their broker-dealer in the U.S. to go to Japan and buy the shares, and that's what the broker-dealer did. The broker-dealer delivered the shares to Teamsters, and Teamsters is alleging only a violation of Japanese law, right? No U.S. Exchange Act claim there. Why? Because they recognized the obvious point that if you instruct your broker-dealer to go overseas to buy shares, that's going to be a foreign transaction, and that's imputed to you. So when we turn to AIPTF and Barclays, they did the same thing. AIPTF instructed its broker, go to Japan, buy the shares, and then they did one other thing. They wanted the shares converted into ADRs. Let's talk about that for a minute because that's an extremely important point here. When shares are converted from foreign common shares into ADRs, that's not a purchase or sale transaction. That's not governed by the U.S. Exchange Act. That is AIPTF and ClearBridge changing the form of their ownership. They've already got ownership of the underlying common shares. They bought those. Do you have any authority for that piece? So we've got this model of, I mean, I think your argument is we have one security, not two? Well, they purchased the common shares. So in other words, if ADRs are a security, and they are a security at least in some circumstances, how do they exist, come into being, and into the plaintiff's hands without a transaction? Well, it's a conversion transaction and not a purchase or sale transaction. And do you have authority for that? Well, yes. I mean, first of all, there's information in the record here, okay? The plaintiff's complaint at paragraph 52 alleges that the conversion transaction is like a hat check. When you go to a restaurant, you put your hat or your coat, and you get a receipt for it. That's not a sale transaction. You're not selling your hat or your coat. When you go to your parking garage and they take your car, you're not selling it to them. You're getting a receipt, ADR, American Depository Receipt. And what if, I guess, and this is where I'm going with this, could a plaintiff sue either Clearbridge or Barclays with respect to the domestic ADRs in connection with fraud? Again, not this case, but in a case. So my concern here is if we're pushing the entire transaction overseas, and there is a domestic security, and right, as Morrison says, it's talking about domestic transactions in securities, not transactions in domestic securities. But if we have a domestic security, this ADR, and there's fraud with respect to that, which I don't think would be actionable in Japan, what do we do? Does that create a troubling gap here under the logic of Morrison? No, there's no gap at all. So the initial transaction where AIPTF is converting its shares from Japanese common shares into ADRs, that's not a purchase or sale transaction. That's just a conversion, right? There's no change of consideration there. There's no payment by Citibank for the shares. In fact, they just charge little fees for handling and for overseeing the shares. But the receipt is a security. Judge Wardlaw and her prior panel held that. So when that gets traded back on the U.S. secondary market, that is a security involved in purchase and sales, and there can be Exchange Act claims based on that. But the issuance, the original issuance of the ADR from Barclays to Clearbridge for the benefit of plaintiffs is not a transaction? The original issuance of the ADR by Citibank, right, or Citicorp, for the common shares, that's not a purchase or sale transaction. That is like a bailment. They're holding the shares. AIPTF remains the beneficial owner. They can redeem at any time, just like you can get your hat back. So it seems like you'd have the, you would concede with your friend that should we get in connection with a security, that one of the reasons it's a foreign transaction, according to your theory, is that, is that is precisely because of that connection. These are almost as good as Toshiba securities, because they are bought and sold over there, and so what the plaintiffs own here is basically as good as a, because there hasn't been an intervening transaction, just a conversion, it's as good as a Toshiba security. At that first stage, yes. I mean, I do agree with what Mr. Daley said about the in connection with is a separate, I think, analytical step from whether the Exchange Act applies. But if you have two different securities, I think that, but that would make sense. I think that's consistent. If there's not a transaction, what's missing here is away from that piece. We just don't have a transaction, whether or not the fraud was in connection with that security over in Japan. That's right. Yeah. So, but, so I think we'll, we'll eventually win no matter what on the in connection with argument, but, but more fundamentally, the Exchange Act does not apply to that transaction. What we have here are two different plaintiffs who basically did the same thing. They instructed their broker dealer, who again, is almost by definition to be an agent, to go overseas to buy the shares. So, the purchase and sale transaction took place in Japan on the Tokyo Stock Exchange. That, therefore, the U.S. Exchange Act doesn't apply. One of those plaintiffs, AIPTF, chose to take an additional step. You know what, I don't want the shares just as the shares are. I want an ADR instead, because that way I get my dividends in dollars instead of yen. And that way, I don't have to worry about voting, you know, there might be a variety of reasons an investor wants an ADR instead of the underlying shares. But that, but that, that conversion of its ownership from the form of direct ownership of common shares to an ADR, that does not have significance for the Exchange Act. Isn't that a little weird under the kind of policy of the Exchange Act that then we have, that the, in the secondary markets after the ADR goes off and you have this receipt, that the plaintiffs who originally purchased the ADRs in reliance on, assuming it's a domestic transaction, or in reliance on Barclays, or whoever was the domestic end of this, in your view, unified transaction, that they have no cause of action for any fraud, American cause of action for any fraud with respect to that end of the transaction. But then the people later on in the secondary markets would have a cause of action with respect to fraud over in Japan? Yes. Pendant on the in connection with piece? Yes. And you think that's anomalous. I think that's faithful to Morrison, which says that we assume the Exchange Act, like all federal statutes, applied at the borders of our territory. And Justice Scalia wrote in that in that case, how do we determine whether a securities transaction is in the U.S. or not? Well, and add on absolute activists to this analysis. But it's territorial. So someone who purchases from the plaintiffs an ADR, exact same cause of action, domestic? Yes, because their purchase and sale transaction was in the U.S. purchase and sale transaction was not. That's it. That's the test that Morrison and Stoyos one and absolute activists insist upon. And that's why it's that there should be no question here. The Exchange Act doesn't apply to that transaction. And I didn't give a complete answer earlier when you asked about what's my evidence for that, that the conversion transaction is not a purchase or sale transaction. I'd asked about the authority. I want law answering it, not facts. Case? Well, I have cases that say that a conversion, a change in one's ownership form does not constitute a purchase or sale. Yeah, I do. And we cited these cases in the district court, and I thought it would be unnecessary to cite them here, but one we cited is Isquith versus Caremark International, 136 F. 3rd, 531, 535, 7th Circuit, 1998, affirming dismissal of claims under Section 10B, holding, quote, a change in form of stock ownership, my brackets on stock ownership, will not count as a sale and so will not be actionable. To the same effect that there are, there's a whole line of cases. Another case to the same effect is International Controls Court versus Vesco, 490 F. 2nd, 1334, 1343, 2nd Circuit, 1974, holding that a transaction interposing a subsidiary as an intermediary title holder did not satisfy Section 10B purchase or sale requirement because parent retained control. Here again, as established in Stoyos 1, AIPTF remained the beneficial shareholder even after the creation of the ADR. That's kind of by definition. Citibank becomes the title holder, but AIPTF is still the owner, still the beneficial owner. And so all it was doing in that second step transaction was changing the form of its own ownership, creating a security. Did you find anything close in the Ninth Circuit to that line of authority? No, I didn't find anything in the Ninth Circuit. No, but this is, this point about how one's reforming one's ownership of any asset I think has got broader legal basis, right? I mean, the fact that you can unilaterally change the form of something you already own and have that constitute a purchase or sale, I think that that's untenable. The notion that, again, I could. The NCP is supported by law, you have Ninth Circuit law on that. The Clearbridge is much, that was. Yeah, that the broker dealer is an agent. And that when they purchased the AI, that that was actually. That's kind of based on the factual chain here, right? That based on the Bloomberg chat that we've provided to the court where Clearbridge is asking Barclays to go buy the shares and Barclays is confirming the financial terms of that transaction. And then the Clearbridge representative says, yes, go ahead and do it. That's about as clear an agency instruction and ratification as one will ever see in commercial transactions. OK, and that I assume is in the undisputed facts submitted to the statement of uncontroverted facts. Yeah, well, and well, the Bloomberg chat I'm referring to, the key part of it is not 2 ER 281. And may I continue? I think my time may be up, but there you will see two representatives of Barclays, Queenie Yuen and John Omari, conferring with Lisa Utazi from Clearbridge. And you can see there, again, I'm on 2 ER 281. And you've got at 11, 13, 19 on March 23rd, 2015, Queenie says, hey, Lisa, I got your Toshiba ADR ticket back. Thank you. And then she adds, we'll advise once we have the conversion rates, et cetera. Lisa from Clearbridge, thank you. Queenie, thank you. Thank you. A little later. And this is at 11, 26, 24. Council, I don't want to interrupt you, but I'm going to. It's in a different language. It's maybe the, do you have the translated portion? This is in English. This is 2 ER 281. Oh, I got it. Yeah. Thank you. Okay. So, and then I'm getting to the key, a key part at 11, 26, 24. This is in the middle of the page now. Queenie from Barclays says, FX, that's foreign exchange rate, right? If it wasn't an agency transaction, why would you be telling your customer about what the exchange rate is? Conversion credit, 5C, that's the terms for the conversion to the ADR. And then it's got the price. And it says, when I book out, I will have 4 cents per share as commission. This is a standard brokerage transaction where the customer's ordering shares and the broker dealer is charging a commission. And then Queenie from Barclays adds, please let me know if you agree. Okay. Hey, Mr. Customer, Ms. Customer, are these terms satisfactory to you? And then she responds at 11, 48, 18, yes, thanks. And then John Omori, also from Barclays, is Queenie's colleague, responds, great. Filling the fixed ticket, that's a communication platform to get the ADRs. Thank you. So, again, this is, this isn't close. This is a standard conventional instruction from a customer to a broker dealer to go buy shares and that's what was done here. And that results in a foreign transaction on the Tokyo Stock Exchange. So the counterparty to that is a stranger on the Tokyo Stock Exchange who was selling the common shares. Title transfers in Tokyo, we know that because under BETA, the Book Entry Transfer Act, title changes when the names of the registered shareholders change. And that's where irrevocable liability attaches on both sides. The subsequent transaction, the conversion transaction, is irrelevant to the analysis under Morrison and under Stoyos One. All right, thank you, counsel. Thank you. Mr. Daly. Thank you, Your Honor. Three quick points. First of all, my friend said that AIPTF had their broker dealer go to Japan. No, they couldn't do that. They can't tell Barclays how to get the underlying shares and our expert in his report said that that could not be done and remember, they did not challenge his expert qualifications. Number two, my friend talked about AIPTF's Toshiba shares in Japan. There were no AIPTF Toshiba shares in Japan. There was no title of those shares handed over to AIPTF. There were no basis points paid by AIPTF in Japan. It was Barclays. Barclays acquired those shares in Japan, placed them in its own account, and then later gave them to Citibank for the conversion that he says doesn't even matter. Number three, he says this was not a sale of the ADRs. Well, that's news to AIPTF who paid $722,000 for something that was not a sale. So when did they pay the money? When did the liability to pay the money become irrevocable? It happened on March 20th, 2015. That is the point, and my friend just mentioned that, the conversation going on, hey, we're filling your ticket. At that point, Clearbridge could not have backed out of the deal. At that point, irrevocable liability on both the purchaser and the seller attached to the transaction. But that's midway through the six days that I was talking about. The initial order came in on a Friday, three days before that. The irrevocable liability. When did this conversation, the Barclays chat, occur? I believe it's on March 20th, 2015, and then three days after that, having already agreed to that price, the shares are then placed into Amalgamated Bank for AIPTF. At that point, AIPTF took title to those shares, which satisfies this court test under Morrison. Who bears the risk? I'm trying to understand what the subject of the initial transaction is. Initial risk was all Barclays in Japan. Believe me, when they went and bought those 600 and something shares of Toshiba Common Stock, they held the risk. Okay, so you have irrevocable liability committed to what? What is the subject matter of the initial discussion? ADRs that have no stock underlying them? ADRs that will eventually have shares underlying them. The irrevocable liability attached, as I said, on the 23rd in the United States, in New York City, because Barclays came back to Clearbridge and said, we are filling your ticket. We've agreed upon the price. We're filling your ticket. The transaction is going through. Toshiba doesn't know whether Barclays did a fresh conversion of ADRs, or whether, as we allege and argue, Barclays actually went to the Citibank Crossbook, which had existing Toshiba ADRs. Our expert opined that the amount of Toshiba ADRs in the United States did not increase as a result of this transaction. If you've, if you, so I guess what you're suggesting is, because as I understand that description, your friend on the other side would agree that if you're buying ADRs that had already been transacted. The secondary market. Right, if that's the case, then what you're really claiming is that there's a genuine issue of fact as to. Well, that's, this entire appeal is imbued with issues of fact. Honestly, we have two different, you can tell we have two different views. That was exactly my question, is after hearing all this, is this, are we really looking at a factual dispute or not? Or is it a legal dispute? I think it's both. I think, I think both. I think. Just.  Are the facts of when each of these things occurred and what occurred on each of these days, are they undisputed underlying this that we can just go look in the record and say, okay, this is when the order was placed. This is when the shares were filled. This is, and we can look at all that and then apply the law to figure out whether it's a transaction or not a transaction under the exchange act. You can do both, your honor, and we still prevail. And that is because both sides have agreed that the underlying transaction record is undisputed. All right, it's, as the district court said, it's the legal significance of what happened at that point, but this, on a, on a, from a legal standpoint, this court in Stoyes, and, and the, quoted the SEC as saying, ADRs and the deposited securities, the underlying common shares, are separate securities. We are here, we brought this lawsuit in 2015 based upon the def, the, the inflated ADRs that our client purchased. That is the relevant security for purposes of that lawsuit, and that is the relevant security for purposes of Morrison. They keep on trying to point to the underlying. You mean relative, relevant transaction, right? Morrison points us to a transaction, and so the question. The relevant transaction here is this. It's, it's, it's not the underlying. So you, you, you dispute that it was a conversion. I don't. Where should we find in the record an area where, where you would raise a, a genuine dispute of, of fact as to that question that you, you, you discussed? You weren't sure where, you said your client wasn't sure where they got the ADRs from. Whether it was from a conversion or. If I said it like that, Judge Johnstone, I apologize.  No, what I said was our expert disputes their version of what happened. They make it sound as though this was a brand new conversion. Our experts said Barclays took its underlying Toshiba shares, went to the Citibank cross book here in the United States, and swapped, if that's the verb, swapped them out for existing ADRs that did not increase the, the, the number of ADRs in the United States. They were there. They were in Citibank's cross book. But Citibank's not a party to the transaction with AI, AIPTF. Citibank gives those ADRs to Barclays who then turns and fulfills its obligations. That conversation that my friend quoted to you fulfills its obligations and sends those ADRs to AIPTF's holder here in the United States, Amalgamated Bank in New York City. The underlying, I, I really want to emphasize this. The underlying Toshiba shares, AIPTF had no risk at all for those shares. The risk was completely on Barclays. If those shares, after being purchased, dropped, went up and down a couple yen, that's on Barclays. That's not on AI, AIPTF. AIPTF was negotiating the price of the ADRs. That would happen much later in the process. And if your honors have no further questions. Well, I, I guess, I, I, I'd be asking for some breadcrumbs here to understand. So, as I understand it, there's no, there's no, there's no dispute as the facts on the ground as to, as to what people said and what was recorded in terms of the discussion, what, what happened. And so then the question is the legal effect. It sounds to me, again, we're asking, you're asking us, both parties are asking us to determine whether the legal effect of, of that was a purchase or a sale that then would have happened domestically. Or a conversion of, of assets that were originally purchased or sold in Japan. Where should we go to answer that, that question? Well, again, three quick points. Just to beat this dead horse, all ADRs have to start, have to undergo a conversion at some time. And where did that happen here? It happened on the Citibank cross book when it exchanged cross book ADR shares for the, the Toshiba common stock that Barclays put into the Citibank cross book. And that's undisputed. Whether it's a conversion, the characterization separately. But the fact that the cross book issue is undisputed. I mean, I believe the other side disputes that. They make it sound as though there was an underlying conversion that happened in Japan. But, and your Honor asked for bread crumbs. No, an underlying. Those bread crumbs are in the expert report. Pardon me. An underlying transaction in Japan by which a IPTF took ownership. No. Which was subsequently converted. That's what I understand. No, no, no, I'm sorry. And if I've led you to believe that, that is, I apologize. No, no, no, I'm saying this is what I understand. Well, that's what you understand from Toshiba.  No, AIPTF had no involvement in Japan. I mean, I was writing these down. It makes it sound as though AIPTF said to them, yeah, go to Japan. AIPTF doesn't care where Barclays gets the, gets the shares. Are you saying Barclays was not AIPTF's agent? Agent, not, not in the least. Not in the least. Barclays in Japan. No, Clearbridge was AIPTF's agent, all right? Clearbridge transacted. And who did Clearbridge respond to? I'm sorry? Who did they respond to? Clear, when you say, during that conversation? Obviously, there is a directive that came from AIPTF. Yes. To Clearbridge, yes. Go out and get us ADRs at the market price. Correct. In other words, whatever the market price happens to be, please go get us 36,000 of them. That Friday, March 20th, 2015, Clearbridge reaches out, right? For acceptance, whatever, reaches out to Barclays. Hey, we've got a client that wants 36,000 ADRs. Can you help us? And Barclays says yes. And then Barclays does what Barclays does. AIPTF doesn't know if Barclays is going to Japan, doesn't know if it's going to Australia, doesn't know if it's going to Canada to get those underlying shares. It doesn't care. It just wants those 36,000 ADRs at, at the market price. That's the extent of AIPTF's involvement. I don't even want to say involvement with Barclays. Their involvement was with Clearbridge, and Clearbridge contacted Barclays. AIPTF had no modicum of risk over in Tokyo. In fact, there, there are, there's something in, in the record about, Toshiba says in their brief that they borrowed the shares, but they also say in other places they purchased them, which brings me back actually to my final point, which is, yes, there are factual issues here. There are tribal issues of material fact. We're here on a, on a summary judgment grant, and under this court's de novo review, there are certainly, there are just mounds and mounds of tribal issues of material fact. But I'll tell you what's not at issue, and that is where the transaction in the relevant security happened. The relevant security, as this court said the last time this case was here, is the ADR, not the underlying Toshiba Commons stock. And that relevant transaction occurred here in the United States, which is why we have a claim. All right. Thank you, Your Honor.  AIPTF versus Toshiba will be submitted.
judges: WARDLAW, MENDOZA, JOHNSTONE